**Not for Publication**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SUSAN ROGERS,<br><br>            Plaintiff,<br>       v.<br><br>CONTINENTAL AIRLINES, its employees, agents, and/or servants, and John Does (#1-10)(being fictitious)<br><br>            Defendants. | Civil Action No. 10-3064 (KSH)<br><br>**OPINION** |

**Katharine S. Hayden, U.S.D.J.**

Plaintiff Susan Rogers filed this action asserting state law tort and breach of contract claims based on her removal by defendant Continental Airlines, Inc. ("Continental") from a flight bound from Newark to Cancun, Mexico.[1]  Continental removed this case to federal court and now moves for summary judgment (D.E. 19), arguing that Rogers' claims are pre-empted by international conventions governing airline liability in connection with international air travel.  Continental also argues that Rogers' complaint fails to state a viable cause of action under the conventions.  For the reasons stated below, Continental's motion is granted.

**Background:**

This suit arises from Rogers' removal from Continental Flight 1730 from Newark to Cancun, Mexico, on February 4, 2009.  When she purchased tickets for the flight, Rogers

---

[1] Rogers' action also lists "employees agents, and/or servants" of Continental and John Does 1-10, but she never amended her complaint to identify these additional defendants.

1

requested adjoining seats for herself and her two-year-old daughter, but she claims she was told that the seat assignment had to be done at the airport. (Dep. of Susan Rogers, Dec. 21, 2010 ("Rogers Dep."), D.E. 21, ex. D at 23:10-23.) According to Rogers' deposition testimony, when she arrived at the ticket counter at Newark Liberty International Airport, she was told to speak to a supervisor at the gate about seating, and then an agent at the gate told her to wait until boarding. (*Id*. at 20:22-21:1 and 25:8-13.) After Rogers boarded, a flight attendant helped her find adjacent seats in an exit row. Rogers sat down and began feeding her daughter when a second flight attendant told her she had to move because her daughter was too young to sit in an exit row. (*Id*. at 34:10-5-35:1-4 and 36:13-17.) Rogers replied that "we can sit here" because the first flight attendant had seated them there, but the second flight attendant insisted that Rogers and her daughter move.

Rogers eventually to wait in the kitchen galley, where she began talking on her cell phone. (*Id*. at 36:17-22.) A flight attendant told her that she "needed to get off my phone," but Rogers replied that "the pilot didn't announce not to be on your phone and I'm talking to my Mom." (*Id*. at 38:4-39:3 and 39:7-12.) The flight attendant then told Rogers to stop talking on her phone or else exit the plane. (*Id*.) Rogers said that she "wasn't getting off the plane" and continued speaking on the phone for another six or seven minutes. (*Id*. at 44:18-45:1.) The flight attendant returned with a supervisor, who asked Rogers to leave the plane. (*Id*. at 39:14-17; 40:1-10.) Rogers refused to leave, objecting that "I need to know why I'm getting off the plane." (*Id*. at 40:1-10.) Rogers testified that the supervisor did not give her an explanation, but he did tell her three times to leave. She refused. (*Id.* at 83:25-84:3.) According to Rogers, the supervisor was polite at first, but he gradually began

2

raising his voice and eventually "grabbed my pocketbook, my carry-on and the baby's bag and he threw it on [the jetway]." (*Id*. at 40:6-10 and 84:4-12.)

Rogers claims that she never raised her voice during the encounter. (*Id*. at 50:15). However, three flight attendants who filed reports after the incident described Rogers as "extremely rude," and as "cursing" and "yelling" when she was asked to move, which she refused to do. (D.E. 19 at exhibits F and G.) According to Continental, when a flight attendant requested that Rogers calm down and speak to the agent about the situation, Rogers responded, "or what. . . what are you going to do if I don't[?]". (*Id.* at exhibit H.)

Rogers testified that, after the supervisor told her to get off the plane, he escorted her to a customer service counter to rebook her flight. (Rogers Dep. at 54:4-25.) Rogers booked a flight for three hours later, but realized she had lost her passport. The customer service agent radioed the plane to find the passport, but the plane had taken off, so the agent rebooked Rogers for the last flight of the day while Rogers drove to Connecticut to get a replacement passport. (*Id*. at 55:24-56:6 and 57:21.) After she had ordered a new passport, Rogers received a call from the agent saying that her passport had been found on the jetway. (*Id*. at 57:10). Rogers left that night on a flight to Cancun, arriving around 2 a.m. on February 5th, several hours later than originally scheduled. (*Id*. at 66:8-10 and 77:1.) Rogers claims that the incident, including replacing her passport, cost her approximately $170. (*Id*. at 58:3, 60:10-17, 67:17 and 68:5.)

Rogers did not suffer any physical injury (*id.* at 71:4-7), but she claims that she was mistreated, publicly embarrassed and distressed at the prospect at not seeing her husband, whom she was meeting in Cancun. (Pt.'s Br. in Opp'n, D.E. 21 at 2.) Rogers asserts that she cried for days after the incident, and, after her vacation, sought treatment from a

3

psychiatrist for "ways to deal with what happened to [me] on the flight." (*Id*. at 87:5-9 and 72:15-17.) However, Rogers acknowledges that she stayed for her full vacation in Cancun, where she shopped, visited a zoo and spent time with her husband (*Id*. at 77:11-18).

Rogers filed a three-count complaint against Continental and various unnamed defendants in May 2010, alleging: (1) intentional infliction of emotional distress; (2) negligent infliction of emotional distress; and (3) breach of contract. (D.E. 1.) Defendants removed to federal court based on diversity jurisdiction pursuant to 28 U.S.C. §1332 and based on 28 U.S.C. §1331, which provides federal jurisdiction because the case arises under an international treaty to which the United States is a party.

**Legal Standard:**

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is "material" only if it could affect the outcome of the suit under the applicable rule of law. *Id.* Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.* In considering a motion for summary judgment, a court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Knopick v. Connelly*, 639 F.3d 600, 606 (3d Cir. 2011); *see also Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Summary judgment is appropriate if the opposing party fails to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).

**Discussion:**

Continental contends that summary judgment should be granted here because the Montreal Convention and its predecessor, the Warsaw Convention, provide the exclusive remedy for injuries suffered in connection with international air travel and that there is no genuine issue as to whether the conventions apply to Rogers' claims. Continental also argues that Rogers' has failed to establish the prerequisites necessary to state a viable claim under the conventions.

The Warsaw Convention[2] aims to "'achieve uniformity of rules governing claims arising from international air transport,'" *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 170 (1999) (quoting *Eastern Airlines, Inc. V Floyd*, 499 U.S. 530, 552 (1991)), and to "limit air carriers' potential liability in the event of an accident." *Sompo Japan Ins. Co. v. Nippon Cargo Airlines Co., Ltd.*, 522 F.3d 776, 779-781 (7th Cir. 2008). The Warsaw Convention thus has been held to "preempt all state claims in [its] scope." *See e.g. Paradis v. Ghana Airways Ltd.*, 348 F.Supp. 2d 106, 111 (S.D.N.Y. 2004). Article 24(1) of the Warsaw Convention provides that, "[i]n the carriage of passengers and baggage, any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention." Article 17 of the Warsaw Convention sets out the necessary conditions to hold "an air carrier [liable] for passenger injury," *Floyd*, 499 U.S. at 535-36 (1991), and states that a carrier: "shall be liable for damages sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident

---

[2] The Warsaw Convention is formally known as the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, 3014, T.S. No. 876 (1934), reprinted in the note following 49 U.S.C. § 40105.

5

which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking."

The Supreme Court has instructed that the Warsaw Convention concerns "only and exclusively, the airline's liability for passenger injuries occurring during travel or 'on board the aircraft or in the course of any of the operations of embarking or disembarking.'" *Tseng*, 525 U.S. at 171-72. Where applicable, the Warsaw Convention "precludes a passenger from maintaining an action for personal injury damages under local law when her claim does not satisfy the conditions for liability under the Convention." *Id.* at 176. In other words, a "passenger whose injuries fall within the scope of the Warsaw Convention is either entitled to recovery under the Convention or not at all." *Magan v. Lufthansa German Airlines*, 339 F.3d 158, 161 (2d Cir. 2003) (citing *Tseng* at 161).

The Montreal Convention[3] went into effect in 2003 and is the successor to the Warsaw Convention. *See Schaefer-Condulmari v. U.S. Airways Group, Inc.*, 2009 WL 4729882, at *4 (E.D. Pa. Dec. 8, 2009). Although the Montreal Convention is an "entirely new treaty," *Atia v. Delta Airlines, Inc.*, 692 F.Supp. 2d 693, 698 (quoting *Ehrlich v. American Airlines, Inc.*, 360 F.3d 366, 371 n. 4 (2d Cir.2004)), many of its provisions "closely resemble those of the Warsaw Convention," including the provisions at issue here. *Weiss v. El Al Israel Airlines, Ltd.*, 433 F.Supp.2d 361 (S.D.N.Y. 2006); *see also Sompo*, 522 F.3d at 781 (explaining that "the Montreal Convention did not alter the [the Warsaw Convention's] goal of maintaining limited and predictable damage amounts for airlines").

Like the Warsaw Convention, the Montreal Convention has been held to "preempt all state law claims within their scope." *Paradis*, 348 F.Supp. 2d at 111; *see also Ugaz v.*

---

[3] The Convention for the Unification of Certain Rules for International Carriage by Air Done at Montreal on 28 May 1999, *reprinted in* S. Treaty Doc. No 106-45, 1999 WL 33292734 (2000).

6

*American Airlines, Inc.*, 2008 WL 4097619, at *1360 (S.D. Fla. Sept. 4, 2008) (finding that Article 29 of the Montreal Convention closely tracks Article 24(1) of the Warsaw Convention and similarly preempts "all state law claims that fall within its scope but do not satisfy the conditions for liability under the treaty") (citation and quotation omitted). Article 17 of the Montreal Convention, which governs airline liability for passengers' personal injuries and which mirrors the language of Article 17 of the Warsaw Convention, provides that airline carriers are "liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking."  *See Schaefer-Condulmari*, at *4 (noting that the "[e]xplanatory Note to the Montreal Convention states that 'it is expected' that the provision of Article 17 governing carrier liability for passenger injury and death will be 'construed consistently with the precedent developed under the Warsaw Convention and its related instruments'") (internal citations omitted).

Accordingly, under Article 17 of both conventions, airline liability for passenger injury in international travel attaches only when "a passenger suffers: (1) bodily injury in (2) an accident that occurred while (3) on board, embarking, or disembarking." *See Id.; see also Terrafranca v. Virginia Atlantic Airways Ltd.*, 151 F.3d 108, 110 (3d Cir. 1998) (citing *Floyd*, 499 U.S. at 535-536).  Whether a passenger's injuries "occurred 'on board the aircraft or in the course of any operations of embarking or disembarking'" is a question of law decided by the court "'based on the facts of each case.'" *Dosso v. British Airways, PLC*, 2010 WL 64922, *4 (D.Md. Jan. 5, 2010) (quoting *Acevedo-Reinoso v. Iberia Lineas Aereas De Espana S.A.*, 449 F.3d 7, 12 (1st Cir. 2006)).

7

a. **Applicability of the Montreal Convention to Rogers' Claims:**

If Rogers' injuries occurred during embarking or disembarking, then her claims fall within the Montreal Convention's scope; if, however, her injuries arose before "operations of embarking or disembarking," then they fall outside the conventions and Continental "is indisputably subject to liability under local law." *Tseng,* 525 U.S. at 172 (internal quotations and citations omitted). Courts examine several factors to determine whether an incident occurred during embarking or disembarking, including**:** "(1) the activity of the passengers at the time of the accident; (2) the restrictions, if any, on their movement; (3) the imminence of actual boarding; and (4) the physical proximity of the passengers to the gate." *Buonocore v. Trans World Airlines, Inc.*, 900 F.2d 8, 10 (2d Cir. 1990) (citing *Evangelinos v. Trans World Airlines, Inc.,* 550 F.2d 152, 155 (3d Cir.1977)). For an incident to be "*in the course of*" embarking or disembarking, there must be a "tight tie between [the] accident and the physical act of entering an aircraft." *Dick v. American Airlines, Inc.*, 476 F.Supp. 2d 61, 64 (D. Mass 2007) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 317 (1st Cir. 1995)) (internal quotation omitted). Injuries held to be within process of "embarking or disembarking" under the conventions include those sustained where a passenger had satisfied "all the conditions precedent" to boarding, *Marotte v. American Airlines, Inc.*, 296 F.3d 1255, 1258–60 (11th Cir. 2002) (finding a claim for injuries within the convention where a passenger was walking to the door to the jetway and was assaulted by an airline agent), or where a passenger had completed almost all steps of the boarding process*. See Evangelinos*, 550 F.2d at 153–4 (holding that passengers who had completed every pre-boarding procedure except for submitting to physical searches and walking 250 meters from the search area to the plane were "embarking" within the meaning of Article

17). Claims held to be outside the scope of the conventions include those for injuries sustained at a substantial distance from the gate, including an accident on an escalator in the publicly accessible part of an airport terminal. *McCarthy,* 56 F.3d at 314–17.

  Here, Rogers already had boarded the plane when the incident giving rise to her alleged injuries occurred. Both Rogers' complaint and her deposition describe the events that caused those injuries—from her confrontation with Continental employees over seating to her removal from the plane and the loss of her passport—as happening onboard the plane and in the jetway. For example, Rogers was standing in the plane's kitchen area talking on the phone when a Continental supervisor asked her to exit the plane and allegedly "pulled at her baby bag and carry-on and threw [the] items from the plane" into the jetway, where she stood picking up the items as "[boarding] passengers stepped over and around" her and her daughter. (Compl, ¶¶ 15-16, 20 and 22.) Rogers argues that her injuries continued "into the terminal" and that "the most emotional harm" occurred at the customer service counter, on the drive to Connecticut and "even after she concluded her trip to Cancun." However, this argument is contradicted by Rogers' admissions that: her "injuries began in the jetway" when Continental "precluded [her] from 'embarking' the flight"; she was "restrained [] from boarding flight 1730"; and "the incident" at issue "took place in the jetway." (Opp'n Br. at 8-9 and 16–17.) Rogers' argument that her injuries happened later also fails because it conflates the alleged "injury-causing" events—including her ejection from the plane and the loss of her passport in the jetway—with the harm that allegedly resulted from those events. *See Bunis v. Israir GSA, Inc.*, 511 F.Supp.2d 319, 322 (E.D.N.Y. 2007). To take one example, Rogers' drive to get a replacement passport was not caused by acts by Continental. On the contrary, once she arrived at the customer service

9

counter, Continental employees tried to *help* Rogers by rebooking her flight and later calling her to inform her that her passport had been found.

 Accordingly, the Court finds that the relevant timeframe for analyzing Rogers' claims is the period when she was on the plane and in the jetway. The Court further finds that Rogers' claim falls within the Montreal Convention's scope because she was in the process of disembarking—actually physically exiting the plane—when her alleged injuries occurred. As Rogers acknowledges, the "jetway area is close to the gate"; moreover, it is a secured area of the airport and the last physical space that a passenger passes through before entering a plane. (Opp'n Br. at 9.) The Court's finding is based on a careful examination of the record, interpretations of Article 17 by other courts and common sense. *See e.g. Ugaz*, at *18 (holding that a claim for injuries by a passenger who recently had left an airplane, remained under the airline's direction and was not in an unrestricted public part of the terminal fell within the scope of the Montreal Convention). In arguing that the conventions do not govern her claim, Rogers relies on cases that are easily distinguishable because they involve incidents that occurred in places a substantial distance from the aircraft and the boarding gate—including a ticket counter, baggage claim and a terminal escalator—and because the cases did not involve actually physically entering or exiting a plane**.** (Opp'n Br. at 7–8.) The Court thus finds that Rogers was disembarking when her alleged injuries occured and that the Montreal Convention preempts Rogers' state law claims.

 The Court next considers whether Rogers has sufficiently alleged facts to support a claim under the Montreal Convention. Continental argues that Rogers is barred from recovery under the Montreal Convention because, *inter alia*, she did not sustain any

10

physical bodily injury within the meaning of Article 17.  Under Article 17, establishing a "direct, concrete, bodily injury" is a "precondition to recovery." *Terrafranca*, 151 F.3d 108, 111 (3d Cir. 1998).  The Third Circuit has held that, to establish that a passenger sustained a bodily injury under Article 17, the passenger must demonstrate actual physical bodily injury and that "purely psychic injuries" and "mere physical manifestations of emotional injuries are not sufficient." *Id.* at 111–12 (finding that a passenger's alleged "post-traumatic disorder complicated by anorexia" as well as by weight loss, anxiety, lack of desire to socialize and other manifestations of emotional distress failed to demonstrate the "direct, concrete, bodily injury as opposed to mere manifestation of fear or anxiety" necessary to recover under the Warsaw Convention); *see also Floyd* at 552 (holding that Article 17 of the Warsaw Convention does not permit recovery in favor of passengers for mental injuries unaccompanied by physical injury); *Carey v. United Airlines*, 255 F.3d 1044, 1051-52 (9th Cir. 2001) (holding that a claim of physical manifestations of emotional distress, including "nausea, cramps, perspiration, nervousness, tension, and sleeplessness," failed to meet the "'bodily injury' requirement in Article 17 of the Warsaw Convention."). Article 17 of the Montreal Convention should be construed consistently with these precedents interpreting the Warsaw Convention.  *Schaefer-Condulmari,* at *4.*

Here, Rogers' complains of "physical manifestations of emotional and mental anguish" (Compl. at ¶¶ 27 and 32), but nowhere in her submissions does she specify what those physical manifestations are and, in her deposition, she concedes that she did not suffer any physical injury.  Her testimony described only emotional harm, including humiliation, shock and a sense that she was mistreated.  However, the Court, viewing the facts in the most favorable light to Rogers, still finds that she has not created a genuine issue of

11

material fact as to whether she suffered a physical bodily injury as required under the conventions, and therefore summary judgment must be granted as to her tort claims. Likewise, Rogers' claim for breach of contract also must fail as a matter of law because it too arises from the events leading up to and surrounding her removal from the flight, and therefore it is pre-empted by the Montreal Convention. *See Paradis*, 348 F.Supp. 2d at 114 (finding that the conventions preempted a passenger's state law breach of contract claim based on a flight cancellation).

Rogers argues that, if the Convention does not apply, then "it leaves liability to be established according to traditional common law rules." (Opp'n at 9.) Because the Court finds the Montreal Convention does apply, it need not consider this argument. Alternatively, Rogers argues that the Convention, though exclusive when it applies, "does not preclude alternative theories of recovery." (*Id.*) In supporting this proposition, Rogers relies on *Abramson v. Japan Airlines Co., Ltd.*, 739 F.2d 130 (3d Cir. 1984), but that case was expressly overruled by *Tseng.* 525 U.S. at 176. As noted above, *Tseng* held that the "Warsaw Convention precludes a passenger from maintaining an action for personal injury damages under local law when her claim does not satisfy the conditions for liability under the Convention" and that recovery for injuries suffered aboard a plane or while embarking or disembarking, "if not allowed under the Convention, is not available at all." *Id*. at 161. The Montreal Convention has been similarly interpreted as precluding "alternative causes of action" for personal injury arising out of international travel. *See Schaefer-Condulmari*, at *5 (holding that "[u]nder the reasoning of *El Al*, the Montreal Convention also precludes alternative causes of action . . . [because as] the replacement for the Warsaw Convention, the Montreal Convention is similarly designed to foster a uniform regulation of

12

international air carrier liability. . . [and the] Montreal Convention, like the Warsaw Convention, will therefore bar any claim outside its terms for personal injury suffered on board an aircraft or in the course of any of the operations of embarking or disembarking"); *see also Weiss*, 433 F.Supp.2d 361, 364 (holding that, where the Convention applies it is "well settled that . . . the Convention provides the sole cause of action under which a claimant may seek redress for his injuries").

**Conclusion:**

For the reasons stated above, the Court grants Defendant's motion for summary judgment (D.E. 19) and dismisses all counts of Plaintiff's complaint. An appropriate order will be entered.

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.

Date: 9/21/11